UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL S. SPAULDING, etc., et al., | ) | CASE NO. 5:16-cv-1748 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is plaintiffs' motion, pursuant to Fed. R. Civ. P. 55(b)(2), for a default judgment on liability against defendant Islamic Republic of Iran ("Iran") (Doc. No. 24 ["Mot."]), and for a hearing to determine the amount of damages. The motion is supported by several declarations. (Doc. Nos. 27, 28, 29, 30, 31, 32, 33, and 34.) On January 8, 2018, plaintiffs filed a status report (Doc. No. 25), along with their last declaration, indicating that they anticipate no further filings in support of their motion. Therefore, the motion is ripe for determination. For the reasons set forth herein, plaintiff's motion for a default judgment on liability is granted. The Court will set a hearing on damages by separate order.

## I. DISCUSSION

This action was brought by the Administrator of the Estate of Michael Calvin Spaulding[1] ("the decedent") under 28 U.S.C. § 1605A, the so-called "terrorism exception" contained in the Foreign Sovereign Immunities Act of 1976 ("FSIA"), to recover wrongful death damages for the benefit of the decedent's surviving spouse and children. The decedent was a U.S. Marine, one of

---

[1] *See* certified copy of Letters of Authority for Michael S. Spaulding, Administrator of the Estate of Michael C. Spaulding. (Welling Decl. [Doc. No. 29] ¶ 4 and attachment.)

the many victims of the October 23, 1983 suicide bombing attack on the U.S. Marine Headquarters in Beirut, Lebanon ("the Beirut barracks bombing"). Although the complaint originally named three defendants, two were voluntarily dismissed by plaintiffs on November 21, 2017. (*See* Doc. No. 26.) The only remaining defendant is Iran, whose default has been noted by the clerk. (*See* Doc. No. 22.)[2]

A default *judgment* is not automatic simply because Iran is in default. Under 28 U.S.C. § 1608(e), "[n]o judgment by default shall be entered by a court of the United States . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court[.]"

**A.      Sovereign Immunity and Jurisdiction**

Foreign states are "presumptively immune from the jurisdiction of the federal and state courts[.]" *Owens v. Republic of Sudan*, 864 F.3d 751, 763 (D.C. Cir. 2017) (citing 28 U.S.C. § 1604). There are several exceptions to this immunity, one being the "terrorism exception" in 28 U.S.C. § 1605A, which "provides the sole means for suing a foreign sovereign in the courts of the United States." *Id.*

The FSIA terrorism exception has an intricate history.[3] *Id.* at 763-65; *see also Rubin v. Islamic Republic of Iran*, No. 16-534, 2018 WL 987348 at *4 (U.S. Feb. 21, 2018) (providing "a brief review of the historical development of foreign sovereign immunity law"). The current

---

[2] Diplomatic channels were used to attempt to serve Iran with the summons, complaint, and notice of suit (and appropriate translations) on February 19, 2017, but "the Iranian Ministry of Foreign Affairs refused its acceptance." (*See* Doc. No. 18 at 141, 144.)

[3] FSIA was originally enacted in 1976. *See* Pub. L. No. 94-583, Oct. 21, 1976, 90 Stat. 2891 (1976) (codified at 28 U.S.C. §§ 1330, 1602-1611). The terrorism exception was enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act of 1996. Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241 (1996) (formerly codified at 28 U.S.C. § 1605(a)(7)). That original exception was repealed by the National Defense Authorization Act for Fiscal Year 2008 ("2008 NDAA"), Pub. L. No. 110-181, § 1083(b)(1)(A)(iii), 122 Stat. 3 (2008), and replaced with § 1605A.

version of the terrorism exception "with[draws] [foreign sovereign] immunity, grant[s] jurisdiction, and authorize[s] suits against state sponsors of terrorism for 'personal injury or death' arising from … torture, extrajudicial killing, aircraft sabotage, hostage taking, and the provision of material support[.]" *Owens*, 864 F.3d at 765 (citing 28 U.S.C. § 1605A(a)(1)). The statute "authorize[s] a '[p]rivate right of action' against a state over which a court could maintain jurisdiction under § 1605A(a)." *Id.* (citing 28 U.S.C. § 1605A(c)). "Jurisdiction for suits under the new exception extend[s] to 'claimants or victims' who [are] U.S. nationals[.]" *Id.*; *see* also *Bank Markazi v. Peterson*, -- U.S. --, 136 S. Ct. 1310, 1317, 194 L. Ed. 2d 463 (2016) ("American nationals may file suit against state sponsors of terrorism in the courts of the United States.") (citing § 1605A). The statute "provide[s] a uniform source of federal law through which plaintiffs [can] seek recovery against a foreign sovereign." *Owens*, 864 F.3d at 765 (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 59 (D.D.C. 2009)).

Therefore, this Court has jurisdiction over this action.

**B.     Statute of Limitations**

The terrorism exception provides for a 10-year limitations period, as follows:

> An action may be brought or maintained under this section if the action is commenced, or a related action was commenced under section 1605(a)(7) (before the date of the enactment of this section) . . . not later than the latter of --
>
>> (1) 10 years after April 24, 1996; or
>>
>> (2) 10 years after the date on which the cause of action arose.

28 U.S.C. § 1605A(b). The complaint herein claims to be timely, not in its own right, but under the "related action" provision of the statute. In particular, the complaint asserts that it is related to *Peterson v. Islamic Republic of Iran*, Case No. 01-2094/01-2684 (D.D.C.), a consolidated case

3

allegedly filed in 2002[4] that involved the same Beirut barracks bombing.[5] (Doc. No. 1, Complaint ["Compl."] ¶¶ 26, 27.)

The U.S. District Court for the District of Columbia, which has handled a number of cases brought under the terrorism exception, has previously addressed this concept of "related action." In *Sheikh v. Republic of the Sudan*, 172 F. Supp. 3d 124 (D.D.C. 2016), the court explained:

> The "related action" concept is elaborated in § 1083(c)(3) of the 2008 NDAA (the act that created § 1605A), which provides in relevant part:
>
>> **Related actions.**—If an action arising out of an act or incident has been timely commenced under section 1605(a)(7) of title 28, United States Code, . . . any other action arising out of the same act or incident may be brought under section 1605A of title 28, United States Code, if the action is commenced not later than the latter of 60 days after—
>>
>> **(A)** the date of the entry of judgment in the original action; or
>>
>> **(B)** the date of the enactment of this Act [Jan. 28, 2008].

*Id.* at 131 (quoting 2008 NDAA, § 1083(c)(3) (codified at 28 U.S.C. § 1605A note)) (alterations in original).

> In other words, if an earlier ("original") action based on an incident was timely commenced under the old version of the terrorism exception, a new action based on the same incident can be commenced under the new version by March 28, 2008, or 60 days after judgment was entered in the original action, whichever is later.

*Id.* Therefore, "some new actions that would have been clearly untimely standing on their own are nonetheless timely by virtue of the existence of a related original action." *Id.*

---

[4] Judging from the case number, it appears that *Peterson* may actually have been filed in 2001.

[5] The ruling of the district court in *Peterson* granting default judgment against Iran on liability is published at 264 F. Supp. 2d 46 (D.D.C. 2003). It is relied upon extensively herein.

In a previous order, this Court noted that judgment in the *Peterson* case was entered on September 7, 2007 (according to online records of which this Court may take judicial notice),[6] but the instant case was not filed until July 8, 2016. This is well beyond the 60-day time frame provided by the 2008 NDAA.

This Court asked plaintiffs to address the question of timeliness in any motion for default judgment, and plaintiffs have done so. Rather than argue that their action is timely within the law outlined above, plaintiffs assert that a statute of limitations defense is waived by a defaulting defendant, such as Iran in this case. (Mot. at 159-61, relying upon *Owens*, 864 F.3d at 804 (finding that "the limitation period in § 1605A(b) is not jurisdictional[]" and that, "by failing to raise it in the district court[,]" defendant forfeits the defense).) Plaintiff is correct. Since Iran has failed to appear and defend on the basis of timeliness, this Court has "no *obligation* to raise the time bar *sua sponte*." *Day v. McDonough*, 547 U.S. 198, 205, 126 S. Ct. 1675, 164 L. Ed. 2d 376 (2006) (emphasis in original; citations omitted).

**C.     Iran's Liability**

As already noted, the FSIA provides that a default judgment cannot be entered against a foreign state except upon "evidence satisfactory to the court." 28 U.S.C. § 1608(e). In the case of a default, as here, the Court may not "simply accept a complaint's unsupported allegations as true." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). Courts are obligated "to inquire further before entering judgment against parties in default." *Id.* (internal quotation marks and citation omitted).

---

[6] Federal courts may take judicial notice of "'proceedings in other courts of record.'" *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n. 5 (6th Cir. 2005) (quoting *Rodic v. Thistledown Racing Club, Inc.*, 615 F.3d 736, 738 (6th Cir. 1980); Fed. R. Evid. 201).

"In support of default judgment, courts in FSIA cases may look to numerous evidentiary sources to satisfy their statutory obligation." *Id.* "[A] court can rely upon plaintiff's uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Id.* (internal quotation marks and citations omitted). A plaintiff "may also [separately] submit evidence in the form of affidavits." *Id*. Finally, a court may "take judicial notice of related proceedings and records in cases before the same court." *Id*.

This Court is unaware of any related proceedings in the Northern District of Ohio and plaintiffs have pointed to none. Plaintiffs argue for use of evidence submitted in the U.S. District Court for the District of Columbia, asserting that the "ECF/PACER system . . . makes the electronic retrieval of documents and evidence from proceedings in any Court just about as quick and reliable as pulling documents from any Court's own records." (Mot. at 163.) Unfortunately, ease of retrieval may be true for documents, but not for evidence. This Court may use PACER to access various documents and may even accept those documents as authentic, but that does not mean the contents of those documents constitute evidence. Actual evidence that may have been submitted to a court will usually not be accessible from PACER. In this case, however, the Court has accessed from PACER the transcript of the first day of the bench trial conducted in *Peterson* on March 17, 2003. (Case No. 1:01-cv-02094, Doc. No. 23, filed April 1, 2003.)[7] The Court has independently drawn some findings of fact from the uncontroverted sworn testimony therein. Further, as noted *infra*, in its ruling granting default judgment on liability, the U.S. District Court for the District of

---

[7] There is no transcription of the testimony on the first day of trial that was given by way of videotape. In addition, for reasons that are not apparent from the docket in *Peterson*, the second-day transcript was not filed.

Columbia quoted at length from trial testimony. This Court can reliably draw its own fact-findings from such quoted testimony.[8]

Plaintiffs further argue that, because the same matters at issue here have previously been decided in another court, offensive collateral estoppel precludes re-litigation of any issue "previously contested and lost by the defendant." (*Id.* at 161.) Relying on *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979), plaintiffs assert that "a plaintiff not a party to the prior action [is permitted] to raise collateral estoppel and preclude litigation of an issue previously contested and lost by the defendant." (*Id.*) This if far too broad a reading of *Parklane Hosiery*, whose applicability is highly questionable here.[9]

Plaintiffs, urging the Court to apply this theory of collateral estoppel, have provided a copy of the May 30, 2003 Memorandum Opinion in *Peterson* (a case involving the same Beirut bombing as this case), whose findings of fact they seek to have credited herein. (Doc. No. 24-2, published at *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003).) Plaintiffs have not cited any case where a defaulting defendant (such as Iran both here and in *Peterson*) was deemed

---

[8] Although plaintiffs have supplied a copy of this ruling that they obtained from PACER, the Court has chosen to cite to the ruling as published in the official court reporter.

[9] *Parklane Hosiery* was aptly summarized in *Abbott GMBH & Co., KG v. Centocor Ortho Biotech, Inc.*, 870 F. Supp. 2d 206 (D. Mass. 2012) as follows:

> In *Parklane Hosiery*, a stockholder's class action was brought against a corporation on allegations that the corporation issued a false and misleading proxy statement. 439 U.S. at 325, 99 S. Ct. 645. Before that legal action reached trial, the Securities and Exchange Commission brought suit against the same corporation based on substantially similar factual allegations. *Id.* Although the two cases were filed in the same district, they were assigned to different judges. *See Shore v. Parklane Hosiery Co., Inc.*, 565 F.2d 815, 816–18 (2d Cir.1977). A bench trial was held in the SEC suit, and the district court found that the proxy statement was materially false and misleading. *Parklane Hosiery*, 439 U.S. at 325, 99 S. Ct. 645. The plaintiffs in the stockholder action then filed for summary judgment that the corporation was precluded from re-litigating the same issue in that suit. *Id.* On appeal, the Second Circuit held, and the Supreme Court affirmed, that the Seventh Amendment was not violated by the preclusion of issues in the jury trial by the previous determination of those issues in the equitable proceeding. *Id.* at 325, 335, 99 S. Ct. 645.

*Id.* at 225. That *Parklane Hosiery* is distinguishable from the instant case cannot be in doubt. Notably, the defendant there appeared and defended, unlike Iran here, which is in default.

7

to have "contested and lost" an issue. Further, "courts have concluded that findings of fact are generally considered hearsay, not subject to an enumerated exception to the prohibition on hearsay evidence in the federal rules." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015) (citation omitted). That is, "factual findings 'represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events.'" *Id.* (quoting *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 116 (D.D.C. 2012)). That said, to the extent any actual evidence from a previous proceeding may be available and accessible, a court may use that evidence, plus other evidence of record, to reach its own independent findings of fact. *Id.*

As for judicial notice, also urged by plaintiffs, Fed. R. Evid. 201(b) permits a court to take judicial notice of a fact that "is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Here, this Court may take judicial notice of the accuracy of transcriptions, such as in *Peterson*, and may draw its own independent findings of fact therefrom.

**Findings of Fact**

Decedent, Michael Calvin Spaulding, Jr., was a Lance Corporal in the United States Marines, who died at the Marine barracks in Beirut, Lebanon on October 23, 1983 "[f]rom injuries sustained in [a] terrorist attack on BLT [Battalion Landing Team Headquarters] [.]" (DOD Report

8

of Casualty [Doc. No. 28-1][10].) According to a news report in the Akron *Beacon Journal* at the time decedent's body was returned to the United States, decedent was listed as "missing" for one week after the attack, but his body was later identified. (*See* Doc. No. 27-2.)

Plaintiff Jacqueline Hudgens-Spaulding is the surviving spouse and widow of decedent. (Hudgens-Spaulding Decl. ¶ 4 [Doc. No. 30].) Plaintiff Natika Spaulding is the daughter of decedent. (Natika Spaulding Decl. ¶ 4 [Doc. No. 31].) Plaintiff Michael Spaulding is the son of decedent, and the administrator of the plaintiff Estate. (Michael Spaulding Decl. ¶ 4 [Doc. No. 32]; Welling Decl. ¶ 4 and attachment [Doc. No. 29].) Plaintiff Akeem Spaulding is the son of decedent. (Akeem Spaulding Decl. ¶ 4 [Doc. No. 33].)

During the bench trial conducted in *Peterson*, *supra*, witnesses with first-hand knowledge of the October 23, 1983 Beirut barracks bombing testified. This Court takes judicial notice of that testimony memorialized in the transcript filed in that case, which the Court accessed through PACER (*see* D.D.C. Case No. 1:01-cv-02094, Doc. No. 23 ["Tr."]), and draws several of its independent findings herein from that testimony. The memorandum opinion written by the district judge in *Peterson* also contains other relevant lengthy quotes from trial testimony for which this Court has no transcripts. This Court takes judicial notice of that quoted testimony and draws its own independent fact-findings therefrom.

Colonel Timothy J. Geraghty ("Geraghty"), now retired, was in command of the 24th Marine Amphibious Unit ("MAU") to which decedent belonged. (Tr. 22-23; *see also* Doc. No. 27-1.) The 24th MAU arrived in May 1983 at the Marine Headquarters in Beirut, Lebanon. (*Id.* 24.)

---

[10] This is a true and accurate copy of Department of Defense ("DOD") DD Form 1300, which is the military's official report of the casualty. It was obtained by plaintiffs' counsel from decedent's widow. (Welling Decl. [Doc. No. 28] ¶ 4 and attachment.) The document is self-authenticating under Fed. R. Evid. 902(2)(A).

Shortly before their arrival, in April 1983, the U.S. embassy in Beirut had been attacked by a suicide bomber. (*Id.*) Geraghty described the situation in Beirut as initially "a lot more relaxed environment[,]" (*id.* 25), but noted that "[i]t was changing very fast, very dynamic, and not for the better." (*Id.* 26.) Geraghty also noted that "[w]hat was unique with Lebanon is that you had forces from different countries, a multi-national peacekeeping force[.]" (*Id.*)

The Marine Headquarters was located adjacent to the Beirut International Airport and shared some common roads and perimeters. (*Id.* 30-33.)[11] The Lebanese army was responsible for security at the airport and Geraghty had no control over access to the airport, even though it was very close to the headquarters' perimeter, an arrangement that resulted in "increased . . . vulnerability." (*Id.* 33.) When the airport was open, "there [were] literally hundreds of vehicles coming in there as well as trucks." (*Id.* 34.) The back of the Marine Headquarters, where the truck carrying the bomb eventually gained access, was particularly vulnerable because of the proximity of the airport terminal building. (*Id.* 36.)

Geraghty testified as to his memory of the October 23rd attack, beginning with the unusual quiet in the early morning hours, through the "tremendous explosion" a short time later that blew out windows and disintegrated sandbags, and the "heroic" rescue efforts in the midst of terrible carnage and continuing sniper fire. (*Id.* 41-43.) The final number of casualties was 241, with many more severely injured. (*Id.* 44.)[12]

---

[11] "History uses the 'Beirut barracks bombing' and the 'Beirut International Airport Terrorist Act' synonymously." (Mot. at 163 n.2.)

[12] Geraghty also noted that, "just a couple minutes after us the French got hit at their parachute headquarters just a couple of minutes northeast of us. And the same thing as this, a smaller truck went into the basement and brought down a seven- or eight-story building. They lost 59 paratroopers and over 100 wounded." (Tr. 44.)

Sergeant Steven Russell ("Russell") also testified. He was the sergeant of the guard at the Marine barracks on October 23, 1983. (*Id.* 65.) In the early morning hours of that day, he was in the guard shack at the Marine Headquarters building, which is a "small aluminum frame plexiglas[s] enclosure[,]" with just enough room for himself and a couple of shelves. (*Id.*) The structure had "sandbagged walls perhaps chest high." (*Id.*) At "around 0300, 0400 [he] got a call from . . . Combat Operations Center . . . saying that they had received some sort of threat of a possible car bomb attack or car bomb of some sort." (*Id.* 66-67.) He went to every exterior perimeter post to advise them of the threat and the vehicle description (a Mercedes) that he had received. (*Id.* 67.)

Russell testified that he returned to the guard shack and, as he was making small talk with another Marine, he heard "a very loud -- off in the distance behind me I heard a noise, a pop, a snap. To this day I say it sounded like a two-by-four breaking." (*Id.*) Russell looked over his shoulder and "saw a large yellow Mercedes truck . . . coming through an open gate and bouncing. It was a curb there that he bounced over. As I looked at him I saw him bound through that gate." (*Id.* 69.) As the vehicle proceeded, it came "straight at [Russell,]" and he "saw the vehicle leaning heavily[.]" (*Id.* 70.) He made direct eye contact with the driver, who "had what I call a shitty grin on his face[,]" was in his "mid-twenties[,]" was wearing "a patterned shirt[,]" and had "[d]ark skin" and a "scrubby seven-day beard," a "[m]ustache[,]" and "[c]urly black hair." (*Id.* 71-72.)

Russell said events happened "very quickly, but . . . something snapped inside [him]" (*id.* 72) and he "started heading into the lobby of the building." (*Id.*) The truck was "right behind" him. (*Id.*) He was screaming to everyone "to hit the deck[.]" (*Id.* 73.) He also testified that, pursuant to the rules of engagement, his weapon was not loaded. (*Id.* 74.) Russell heard "[a] very loud bang

11

behind [him]" as the truck "hit the guard shack, my guard shack." (*Id.* 75.) Then he definitely understood that the driver of the Mercedes truck "was attacking us." (*Id.*)

Russell described the headquarters building as "four stories high[,]" "an atrium-style building," where the "second, third and fourth floors had balconies completely surrounding around the building[.]" (*Id.* 76.) As he ran to the building, Russell looked backed toward the truck and saw a "wave of debris come in[.]" (*Id.*) He ran further, but turned back again and saw that the driver had stopped the vehicle. The truck was already badly damaged, perhaps from hitting the guard shack. (*Id.*) Then he saw "a bright flash, a yellow flame that started at . . . the passenger side lower right of the front bumper. It began very quickly, but the flame grew and spread diagonally across directly over the driver's windshield. The next thing I felt was heat and confusion and that was it. I was unconscious." (*Id.* 78.)

Russell was "out for about a minute, a minute and a half[,]" and woke up on his stomach. (*Id.* 79.) He "smelled some sort of explosive." (*Id.*) He saw debris and a cloud of dust and smoke that was dissipating. (*Id.* 80.) The four-story building was "approximately a 15- to 20-foot pile of rubble to [his] left." (*Id.* 81.) Despite the dramatic damage to the building, at least some Marines did not die instantly, instead suffering extreme pain due to their injuries. Russell described hearing Marines screaming for help, but he was injured himself and "couldn't move." (*Id.*) He finally rolled over and saw severe injuries to his left foot and left hand. He "could feel pain, severe pain, stinging, numbness, from the waist down." (*Id.* 82.) The screaming of the others lasted only "[t]wo or three minutes." (*Id.*) Russell testified that, although the screaming stopped then, he "still hear[s] them quite often, every day." (*Id.* 83.) Medics arrived and attended to him, taking him to another location, where he described seeing one very severely injured Marine who "had no back" and "was bleeding." The man died within about 30 minutes. (*Id.* 84.)

At the time of the trial in *Peterson*, Russell was on medication for post-traumatic stress disorder. (*Id.*) He had not slept with his wife "in years[,]" because he was "[t]oo violent." (*Id.* 85.) He acknowledged that "[o]n any given day . . . a sound, a sight or smell brings it [the bombing attack] right back." (*Id.*)

Admiral James A. Lyons, Jr. ("Lyons"), a retired U.S. Navy officer, also testified to his knowledge of the October 23, 1983 Beirut barracks bombing. At the time, he was serving as the Deputy Chief of the Naval Operations for Plans, Policy and Operation. (*Id.* 50-51.) On October 25, 1983, two days after the bombing, Lyons "got to see [a] message . . . formulated in the latter part of September, approximately four weeks before the Marine Barracks blowup." (*Id.* 53.) He testified with regard to the message: "[Y]ou can say that we know with certainty that the Iranian Ambassador called in the leader of the terrorist group, Islamic Amal, (spelled phonetically) Hussein Moussaoui, and gave him instructions to carry out attacks on the forces in Lebanon and to take a spectacular action against the United States Marines." (*Id.* 53, 55 (clarification in original).) When asked whether he had "any doubt . . . as to the authenticity of that message[,]" Lyons responded: "No." (*Id.* 55.) When further asked to confirm that he had "[no] doubt that it was sent by somebody in a position in Tehran to give such an order to the Ambassador[,]" he responded: "Correct." (*Id.*) The court in *Peterson* qualified Lyons as an expert and permitted him to express an opinion with regard to the reliability of the intercept, about which he asserted: "[I]f there was ever a 24-karat gold document, this was it." (*Id.*)

In *Peterson*, the district judge noted that Amal (referenced by Lyons) was "a group of moderate Lebanese Shiites" out of which formed the group of Shiite Muslims known as "Hezbollah" ("the party of God"). *Peterson*, 264 F. Supp. 2d at 51. "Following the 1982 Israeli invasion of Lebanon, the Iranian government sought to radicalize the Lebanese Shiite community,

13

and encouraged Hezbollah to split from Amal." *Id.* The district judge quoted at length from the testimony of Dr. Patrick Clawson, "a widely-renowned expert on Iranian affairs[.]" *Id.* Clawson testified:

> Both from the accounts of Hezbollah members and from the accounts of the Iranians and of every academic study that I'm aware of, certainly at this time, Hezbollah is largely under Iranian orders. It's almost entirely acting at the—under the order of the Iranians and being financed almost entirely by the Iranians. It comes to be an organization with Lebanese roots and Lebanese activities and more independence from Iran, but that's years past this time frame.
>
> * * *
>
> THE COURT: In the '83 time frame, it was essentially a tool of Iran.
>
> THE WITNESS: Correct, sir. Indeed, both Iranian and Lebanese observers have described it as being established at Iran's orders and as being a creature of Iran when it began. Hezbollah leaders today will sometimes describe that as the roots of their party and say that it has evolved away from being that.
>
> Q: Was there any other major means of support for Hezbollah other than the Islamic Republic of Iran?
>
> A: Not at this time, no, sir.[8]
>
> > [8] Dr. Michael Ledeen, a consultant to the Department of Defense at the time of the Marine barracks bombing and an expert on U.S. foreign relations, testified at trial that "Iran invented, created, funded, trained, and runs to this day Hezbollah, which is arguably the world's most dangerous terrorist organization."

*Id.* at 50 (footnote in original). Clawson's testimony was corroborated by Dr. Reuven Paz, who has long researched Islamic terrorist groups. Paz testified that Hezbollah "totally relied upon [ ] the Iranian support[,]" and "started to be trained in training camps . . . where the main Iranian forces were located." *Id.* at 52. Notably, Paz attributed the October 23, 1983 attack to Hezbollah, under the directions contained in the September 1983 intercept about which Lyons testified.

> Q: Do you have an opinion, within a reasonable degree of certainty, as an expert on Islamist terrorism, whether this attack was carried out by Hezbollah, in response to the order which was the subject of the communications intercept in late September 1983?

14

> A: Yes, especially at that time—even today, but especially at that time, when Hezbollah was not yet formed as a strong group, it was totally controlled by Iran and actually served mainly the Iranian interest in Lebanon and [against] Israel.
>
> Q: Do you have an opinion, again within a reasonable degree of certainty, as an expert in Islamist terrorist groups, as to whether Hezbollah, at that time, the fall of 1983, would have had the capacity to carry out an attack of the dimension of the attack around the Marine barracks, in the absence of Iranian scientific, financial, and material assistance?
>
> A: No, I don't think they could have carried out such an attack without Iranian training, without Iranian—Iranian supply of the explosives even, and without directions from the Iranian forces in Lebanon itself.

*Id.* (footnote omitted; alteration in original). Paz testified that the technique of suicide bombing that was used on the Marine barracks "was initiated in Iran . . . [as a form of] self-sacrifice . . . and then . . . it started as a modus operandi of terrorist groups -- first in Lebanon, by Hezbollah, and then later on it moved to the Palestinian arena, mainly during the '90s." *Id.* at 52-53.

Clawson also testified that, "Iran's material support would have been absolutely essential for any activities at that time [October 23, 1983], and furthermore, . . . no one in the organization would have thought about carrying out an activity without Iranian approval and almost certainly Iranian orders." *Id.* at 53. Such activities, according to Clawson, "would also have required the approval of Iran's supreme religious leader, Ayatollah Khomeini." *Id.*

The U.S. Department of State reached the same conclusion regarding Iran's involvement in Middle Eastern terrorist attacks. In its report on *Patterns of Global Terrorism: 1983*,[13] it stated as follows:

---

[13] In *Owens*, 864 F.3d at 792, where a similar report for the year 1993 was challenged on appeal by Sudan as inadmissible hearsay, the court of appeals concluded that these reports "fit squarely within the public records exception." *See* Fed. R. Evid. 803(8). It further noted that, "[o]nce proffered, a public record is presumptively admissible, and the opponent bears the burden of showing it is unreliable." *Id.* (citing *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000)). When Sudan objected to the reports for the first time on appeal, the court held that the "objection should have been made in the district court." *Id.* at 793 (citing Fed. R. Evid. 803(8)(B)). Here, Iran has

> Most instances of state-supported terrorism occurred in Lebanon. There, radical Lebanese Shias, using the nom de guerre Islamic Jihad, operated with Iranian support and encouragement from Syrian-controlled territory. They were responsible for the suicide bombing attacks against the US Embassy and the headquarters of the US and French contingents of the Multinational Force (MNF) in Beirut, which resulted in unprecedentedly high numbers of casualties (557), as well as for numerous other sniping or grenade attacks against French and US interests. . . .

(Wellington Decl. [Doc. No. 24-1] ¶ 6 and *Patterns of Global Terrorism: 1983* (United States Department of State) [Doc. No. 24-4] at 363-64.)[14]

## Conclusions of Law

This Court has both subject matter jurisdiction and personal jurisdiction over Iran under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611, and, in particular, under the exception to foreign sovereign immunity known as the "terrorism exception." 28 U.S.C. § 1605A.

Under § 1605A, "a foreign state that is or was a state sponsor of terrorism[,]" is liable to the individual plaintiffs, who are "national[s] of the United States," *id.*, and to "the legal representative" of Michael Calvin Spaulding, decedent, who was "a member of the armed forces," *id.*, for the death of Michael Calvin Spaulding "that was caused by an . . . extrajudicial killing . . . or the provision of material support or resources for such an act . . . engaged in by an . . . agent of such foreign state while acting within the scope of his or her . . . agency." *Id.*

Under § 1605A(h)(6), "state sponsor of terrorism" means:

a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App.

---

failed to appear to challenge anything, much less this report. Therefore, agreeing with *Owens* that this is a public record, the Court has taken it into consideration.

[14] It is also noteworthy that Iran erected a monument in Tehran to the two individuals (characterized as "martyrs") who carried out the truck-bombing of the Marine Headquarters and the almost simultaneous truck-bombing of the nearby French parachute headquarters. (Compl. ¶ 18 and Doc. No. 1-2.)

2405(j)), section 620A of the Foreign Assistance Act of 1961(22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism[.]

Since January 19, 1984, the Islamic Republic of Iran has been designated by the Secretary of State to be a state sponsor of terrorism. (*See* https://www.state.gov/j/ct/list/c14151.htm) (last visited 2/23/2018).

The term "extrajudicial killing" has "the meaning given [it] in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)[,]" § 1605A(h)(7), that is, "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensible by civilized peoples."

The Beirut barracks bombing was an extrajudicial killing carried out by an agent or agents of Iran, a state sponsor of terrorism, which resulted in the death of Michael Calvin Spaulding and injury to his surviving wife and children for which the Islamic Republic of Iran is liable in damages in an amount to be determined.

## II. CONCLUSION

For the reasons set forth herein, plaintiff's motion for default judgment of liability against defendant Islamic Republic of Iran (Doc. No. 24) is **granted**. By separate order, the Court will schedule a hearing on damages.

**IT IS SO ORDERED**.

Dated: July 2, 2018

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**